Fecteau, J.
This is a claim by plaintiff Catholic Relief Insurance Company of America (“Catholic Re *81 lief’) against defendant the Liquor Liability Joint Underwriting Association of Massachusetts (the “LLJUA”). Catholic Relief seeks to enforce an alleged duty of the LLJUA to contribute its bodily injury coverage to the settlement of a claim over which Catholic Relief and the LLJUA were concurrent primary insurers. Catholic Relief settled a significant bodily injury claim arising out of the alleged negligence of their jointly insured risk, the Roman Catholic Bishop of Worcester (the “Diocese”), for dram shop liability of the Bell Tower Room, a function hall associated with a local diocesan parish and licensed to sell alcoholic beverages. The LLJUA did not consent to the settlement, but instead refused to contribute its policy limit to the settlement, or make any offer, on the ground that the underlying bodily injury case was defensible. Catholic Relief settled the underlying tort action for its full primary coverage limits and is seeking the full coverage limits from the LLJUA.[1]
The First Amended Complaint filed by plaintiff Catholic Relief contains six counts. In Count I, Catholic Relief seeks a declaratory judgment that the LLJUA was obligated to contribute to the settlement of the tort action brought by Brenda Tighe against the Diocese, and is obligated to reimburse Catholic Relief in the amount of $500,000. In Count II, Catholic Relief claims that the LLJUA breached the terms of its policy with the Diocese by failing to settle the underlying suit, causing harm to the Diocese and to Catholic Relief. Count III is a claim for reimbursement under a theory of equitable subrogation. In Count IV, Catholic Relief alleges that the LLJUA was negligent in failing to contribute to the settlement. Count V alleges that the LLJUA breached a common law duty of good faith. Finally, in Count VI, Catholic Relief alleges that it is entitled to contribution from the LLJUA.
The LLJUA defends on three basic grounds: (i) that all claims must fail because the settlement by Catholic Relief was without the consent of the LLJUA and thus in violation of the “voluntary payments” exclusion; (ii) that all claims based on subrogated or assigned rights fail because there was no damage to the Diocese; and (iii) that its (the LLJUA’s) conduct in refusing to participate in the settlement of the underlying matter was not unreasonable. In addition, the LLJUA questions Catholic Reliefs standing as a co-primary insurer to make direct claims apart from the theories of equitable subrogation and assignment of the Diocese’s rights.
This matter came on for trial before me, sitting without jury, on August 12, 13 and 14, 1997. The parties were granted leave to file requests for findings of fact and rulings of law until August 25, 1997, and final arguments were made at that time. On consideration of the evidence and the arguments of the parties, I make the following findings of fact and rulings of law.
FINDINGS OF FACT
I.THE PARTIES
1. At all relevant times, Catholic Relief was a corporation organized under the laws of the State of Nebraska and is engaged in the business of providing and underwriting insurance. (Plaintiffs’ amended complaint, ¶1.)
2. The LLJUA is a nonprofit, unincorporated association created by statute, St. 1985, c. 223, whose mandate is “to provide liquor liability insurance on a self-supporting basis” to persons and entities licensed to sell alcoholic beverages in Massachusetts. Id., §2.
3. The LLJUA is not a profit-making or profit-motivated entity. Under its enabling statute, the LLJUA’s premium rates must be calculated based on its loss and expense experience and investment income from unearned premiums and reserves, and the rates shall be calculated to be self-supporting only. St. 1985, c. 223, §6. Any deficit sustained by the LLJUA shall be recouped by an assessment on the policyholder, or a prospective rate increase. Id.
4. The LLJUA has no owners. Insurers providing personal injury liability insurance in Massachusetts are required to participate in the LLJUA’s operations as a condition of their authority to conduct liability insurance business in the Commonwealth. St. 1985, c. 223, §2. Operating deficits of the LLJUA may be offset by temporary contributions from the insurer “members,” but only until the deficits are recouped through prospective rate increases. St. 1985, c. 223, §§6, 7. Thus, the member insurers derive no profit or compensation from the LLJUA, nor do they suffer any loss if the LLJUA’s premiums and return on investments are not sufficient to cover the LLJUA’s liabilities.
5. The LLJUA is subject to extensive control by the Commissioner of Insurance (the “Commissioner”). In addition to setting the premiums, the Commissioner must approve the policy forms used by the LLJUA. St. 1985, c. 223, §6. The operations of the LLJUA are controlled by the Plan of Operation promulgated by the Commissioner. Id., §4. The Plan of Operation must provide for “economic, fair and nondiscriminatory administration and for the prompt and efficient provision of liquor legal liability insurance.” Id. The Commissioner must make an examination into the affairs of the LLJUA at least annually. A representative of the Commissioner attends the meetings of the LLJUA’s Board of Directors. Any applicant to or insured of the LLJUA may appeal for review to the Commissioner any ruling, action or decision of the LLJUA. Id., §9; 211 CMR22.12.[2]
6. Any liquor license holder who is unable to obtain liquor liability insurance elsewhere is entitled to insurance from the LLJUA, provided only that the applicant has no unpaid premiums for prior insurance and demonstrates that it was not able to obtain liquor *82 liability insurance in the private marketplace. St. 1985, c. 223, §5.
7. During 1991 and 1992, the LLJUA was governed by a Board of Directors consisting of eight directors elected by the member companies, four directors appointed by the Commissioner as representatives of the insured liquor licensees, and one director appointed by the Commissioner as the representative of insurance producers (insurance brokers). St. 1985, c. 223, §8; 211 CMR 22.06. Thus, unlike commercial insurers, representatives of the insureds have a direct say in the operations of the LLJUA.
II. THE UNDERLYING TIGHE SUIT
8. On June 11, 1988, Maureen Sullivan (“Sullivan”) was operating a motor vehicle in which Brenda Tighe (‘Tighe”) was a passenger when it was involved in an accident. As a result of the accident, Tighe was rendered a quadriplegic. The accident occurred following a wedding reception that Tighe and Sullivan had attended at the Bell Tower Room, a function hall adjoining the Sacred Heart Church in Milford, Massachusetts.
9. In September of 1989, Tighe filed an action (the ‘Tighe Suit” or the “underlying action”) in Norfolk County Superior Court, Civil Action No. 89-02557, against Sullivan, the Sacred Heart Church, individually and dba The Bell Tower Room (collectively, “The Bell Tower Room"), and others. (Ex. 1A at CF 00197, CF 00206.)
10. Tighe’s amended complaint in the underlying action alleged that “[a]t all times herein concerned, the defendant Sacred Heart Church, Individually and dba The Bell Tower Room owned and operated the Bell Tower Room, a function hall, located at 7 Cedar Street, Milford, County of Worcester, Commonwealth of Massachusetts.” (Ex 1A at CF 00214.)
11. In her complaint, Tighe asserted: (i) that “[o]n or about June 11, 1988, the defendant, [The Bell Tower Room], through its agents, employees and servants, negligently served or permitted service of alcoholic beverages to Sullivan who consumed said alcoholic beverages in such quantities so as to cause her to become intoxicated”: (ii) that The Bell Tower Room, “continued to serve or permit service of alcoholic beverages to defendant Sullivan, when they knew or should have known that she was intoxicated”; and (iii) that The Bell Tower Room “was further negligent in allowing Sullivan to leave its premises when it knew or should have known she was intoxicated and would thereafter be driving an automobile.” (id.)
12. Tighe further alleged that as a result of the negligence of The Bell Tower Room, “Sullivan so negligently, unskillfully and carelessly operated, managed or controlled her motor vehicle while intoxicated so as to cause her motor vehicle to have an accident on the highway thereby inflicting severe and permanent personal injuries on the plaintiff, Brenda A. Tighe.” (Id. at CF 00215.)
13. As of June 11, 1988, the Sacred Heart Church in Milford, Massachusetts was a part of the Roman Catholic Bishop of Worcester, a Corporation Sole under Chapter 197 of the Acts of 1950.
14. Tighe was represented in her suit by an experienced plaintiffs attorney, Edmund P. Daley of Moquin & Daley. (See Ex. 11 at 2.)
III. THE INSURANCE POLICIES
15. The LLJUA issued liquor liability policy number JL871042108 (the “LLJUA Policy”) to Timothy J. Harrington, The Roman Catholic Bishop ofWorcester. The LLJUA Policy provides coverage from November 25, 1987, through November 25, 1988, and contains the maximum limits permitted by the LLJUA’s enabling legislation, $500,000 per person and $1,000,000 per occurrence. (Ex. 4.)
16. In accordance with its enabling legislation, the LLJUA policy form was approved by the Commissioner of Insurance. The LLJUA Policy provides coverage for “sums which the Insured shall become legally obligated to pay as ‘damages’ because of ‘bodily injury’ to any person, caused by an ‘occurrence,’ if such liability is imposed on the Insured by reason of the negligence of the Insured in the distribution, sale or serving of any alcoholic beverage at the Insured premises.” The policy designates the insured premises as 11 East Main Street, the address of the Sacred Heart Church. (Ex. 4.)
17. The LLJUA Policy further provides that the LLJUA has the right and duty to defend suits seeking such damages, and gives the LLJUA the option to make such “settlement of any claim or suit as [it] deem[s] expedient." (Ex. 4.)
18. The “Conditions” section of the LLJUA Policy states:
[The Insured] will not except at [its] own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.
(Ex,4 at 5, Condition 4.)
19. The LLJUA Policy limits suits against the LLJUA to those seeking recoveiy under a final judgment against an insured or an “agreed settlement,” defined as a settlement and release of liability signed by the LLJUA, the insured and the claimant. (Ex. 4 at 5.)
20. Catholic Relief issued to the Diocese a Special Multi-Peril policy, number 16702, effective from March 24, 1988 to March 24, 1989 (the “Catholic Relief Primary Policy”). The Catholic Relief Primary Policy included a general liability coverage part (Section II) with limit of liability of $1,000,000 for “each occurrence.” (Ex. 3.)
21. The Catholic Relief Primary Policy provides that Catholic Relief:
*83 will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence . . . and [Catholic Relief] shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury
(Ex. 3.)
22. A preprinted “Liability Coverage” policy form included as part of the Catholic Relief Primary Policy contained an exclusion, “exclusion (h),” that excluded coverage for certain claims against the insured arising out of the manufacture, distribution, sale or service of alcoholic beverages. However, exclusion (h) was deleted by an express endorsement to the Catholic Relief Primary Policy effective as of the inception of the Catholic Relief Primary Policy. (Ex. 3.) Therefore, the Catholic Relief Policy provided coverage to the Diocese for liquor legal liability.
23. Catholic Relief also issued to the Diocese an Umbrella Excess Liability Policy, number 16702, effective March 24, 1988, through March 24, 1989, with a limit of liability of $9,000,000 per occurrence (the “Catholic Relief Umbrella Policy”). (Ex. 3.)
24. The Catholic Relief Umbrella Policy provides that Catholic Relief:
will indemnify the Insured for all sums which the Insured shall become legally obligated to pay as damages, ... on account of:
1. Personal Injuries . . .
(Ex. 3.)
25. The Catholic Relief Umbrella Policy does not contain any exclusion for damages arising out of liquor legal liability. (Ex. 3.)
26. The Catholic Relief policies as well as the LLJUA Policy provide indemnify coverage for the claims asserted against the Bell Tower Room in the Tighe suit.
27. The LLJUA Policy contains an “other insurance” provision which provides, in pertinent part:
1. Primary Insurance
This insurance is Primary. Our obligations are not affected unless any other available insurance is also Primary. Then, we will share with that other insurance by the method described in 2 below.
2. Method of Sharing
If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.
If any of the other insurance does not permit contributions by equal shares, we will contribute by limits. Under this method, each insurer’s share is shared on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.
[Tr. Ex.4.[
28. The Catholic Relief Primary Policy contains an “other insurance” provision, which provides, in pertinent part:
(a) Contribution by Equal Shares.
If all of such other valid and collectible insurance provides for contribution by equal shares, [Catholic Relief] shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.
[Tr. Ex.3.]
29. The Catholic Relief Primary Policy and the LLJUA Policy both provide for contribution by equal shares. [Tr. Exs. 3,4; Oral Stipulation by both counsel.]
IV. THE DEFENSE AND CLAIM HANDLING OF THE UNDERLYING TIGHE SUIT
30. To enable the LLJUA to fulfill its statutory mandate of underwriting liquor legal liability insurance and adjusting and paying claims, the Legislature authorized the LLJUA to “appoint servicing companies” to adjust and pay losses arising under policies issued by the LLJUA. St. 1985, c. 223, §3.
31. For the period January 1, 1989, through December 31, 1991, the LLJUA contracted with Alexsis, Inc. (“Alexsis”) to be the LLJUA’s servicing carrier. Under that contract, Alexsis was an independent contractor. (Ex. 12 at 18.)
32. Alexsis had the authority to settle claims for up to $25,000. For claims in excess of $25,000, Alexsis was required to obtain the authority of the claim committee of the LLJUA board of directors (the “LLJUA claim committee”). Alexsis was also expected to report all claims with large damages potential to the LLJUA claim committee.
33. On October 13, 1989, Alexsis, as the LLJUA’s servicing carrier, received notice of the Tighe suit. (Ex. 1A at CF 00241.) The Diocese did not notify Catholic Relief of the Tighe suit at that time.
34. When the LLJUA, through Alexsis, was asked to provide coverage for the Tighe suit, the LLJUA had not been notified that Catholic Relief had issued full liability coverage, general and umbrella liability policies, to the Diocese in effect on June 11, 1988 (the date of the accident alleged in the Tighe suit). Because the LLJUA’s enabling statute prohibits the LLJUA from *84 providing coverage to persons who are able to obtain liquor liability insurance from another insurer, see St. 1985 c. 223, §5, the LLJUA had no reason to believe that the Diocese had obtained such coverage elsewhere.
35. The LLJUA, through Alexsis, retained and paid for Attorney F. Jay Flynn, Jr. (“Flynn”) to defend the Diocese. As an experienced trial attorney, Flynn was well-qualified to defend the Diocese. His retention commenced on October 13, 1989.
36. Flynn retained North River Claims Services, a private investigation firm, to assist in the investigation. (Ex. 1A at CF 00041-00043.)
37. Through November, 1991, Flynn conducted discovery and with the assistance of North River, investigated the claims asserted in the Tighe suit. Flynn regularly reported the results of the investigations and discovery to Alexsis. Discovery included depositions and interviews ofTighe, Sullivan, the staff of the Bell Tower Room, witnesses to the accident, the investigating police officers, and other guests at the wedding reception.
38. In the fall of 1991, the LLJUA decided that, when the contract with Alexsis would expire on December 31, 1991, instead of employing a servicing carrier it would hire and supervise its own employees to handle claims, issue policies, and otherwise conduct the day-to-day business of the LLJUA. Previously, the LLJUA had no employees of its own and did not maintain an office. All files concerning claims against the LLJUA’s insureds were maintained by Alexsis.
39. To prepare for the transition from a servicing carrier to an in-house claims staff, the LLJUA hired Charles W. Bucke (“Bucke”) to serve as Executive Director of the LLJUA. As Executive Director, Bucke would be responsible for supervising the claims handled by the LLJUA. Bucke began working for the LLJUA in mid-October, 1991, and directly participated in the handling of the Tighe suit.
40. Bucke was an experienced claims manager. When he was hired by the LLJUA, Bucke was working as the claim manager of the Boston office of United States Fidelity and Guaranty Company (“USF&G”), a major commercial insurer. Bucke had been working with USF&G for almost twenty-five years. As claim manager, Bucke was the senior-most claims person of USF&G’s Boston office, which was USF&G’s largest claims office.
41. Bucke had also served on the LLJUA’s claim committee since approximately 1989, and had served as USF&G’s delegate to the LLJUA Board of Directors. Bucke resigned those positions on becoming Executive Director of the LLJUA.
42. At the time Bucke became Executive Director, Alexsis had not reported the Tighe suit to the LLJUA’s Board of Directors or the LLJUA claim committee.
43. During the fall of 1991, to prepare for the transition to an in-house claim staff, the LLJUA began to take custody of, and to review, the files that Alexsis had maintained for claims against the LLJUA’s insureds.
44. At some point in November or December, 1991, the LLJUA obtained from Alexsis the claim file for the Tighe suit. Bucke reviewed the file in its entirety.
45. By letter to Flynn dated October 21, 1991, and a virtually identical letter to the Pastor of the Sacred Heart Church dated October 28, 1991, Tighe demanded $2,000,000 to settle her claims against the Bell Tower Room. (Ex. 1C at CF 00535, CF 00537.) This was Tighe’s first settlement demand. In those letters, Tighe asserted that a failure to settle would also subject the Bell Tower Room to multiple damages under G.L.c. 93A.
46. Flynn advised the Diocese that it should consult with its own attorney regarding the claim under G.L.c. 93A and the potential uninsured exposure of the Diocese.
47. The Diocese then consulted with its own counsel, Attorney James Cosgrove (“Cosgrove”), who researched whether additional insurance coverage might be available for the Diocese.
48. On November 7, 1991, Cosgrove notified the insurance broker for the Diocese, Jack Curran of Sullivan, Garrity & Donnelly, of the Tighe suit and requested a copy of the general liability policy and that the general liability carrier be notified of the claim. (Ex. 2 at 0040.) Notice of the suit was given to Catholic Reliefs agent, John Monahan of Kaler, Carney, Liffler.
49. On November 13, 1991, Cosgrove and employees of Kaler, Carney, Liffler met with Flynn to discuss the LLJUA’s investigation and discovery of the Tighe suit.
50. On November 15, 1991, Cosgrove first notified Catholic Relief of the Tighe action.
51. On November 18, 1991, Flynn sent a comprehensive, twenty-five page report to Alexsis summarizing the results of discovery and investigations and the law governing Tighe’s claims against the Bell Tower Room. (Ex. 11.) Flynn also sent copies of the report to Catholic Relief, its counsel, and to Bucke at the LLJUA. On November 20, 1991, the LLJUA authorized Flynn to provide a copy of his November 18, 1991 report to Cosgrove, counsel for the Diocese. (Ex. 1C at CF 00566.)
52. In his November 18, 1991 report to the LLJUA and his prior written reports to Alexsis, Flynn summarized investigation and deposition evidence:
a. The accident occurred in Franklin, Massachusetts on Route 495 at approximately 7:40 p.m. Sullivan was driving in the southbound side of Route 495 when she lost control of her car and suddenly crossed the southbound lanes, the median and the northbound lanes. Sullivan was driving a new 1988 Toyota *85 Célica convertible with the top down. NeitherTighe nor Sullivan were wearing seat belts and both were ejected from the car. Tighe, who was eighteen years old at the time of the accident, was rendered a quadriplegic. Sullivan suffered lacerations to her head, contusions, abrasions and a spinus process fracture. (Ex. 11 at 11.)
b. There was conflicting evidence concerning the cause of the accident. Sullivan testified that at the time of the accident, the cruise control was engaged and set at 58 miles per hour and that she was driving in the center or right-hand lane. She stated that another car cut her off, causing her to swerve to the left and lose control of her car. (Ex. IB at CF 00252.) Tighe testified that Sullivan was driving in the passing lane at a speed of about 70 miles per hour. Tighe further testified that Sullivan’s attention was focused on tuning the radio or putting a tape in the cassette player when Tighe looked up and saw a car directly in front of them. Tighe screamed for Sullivan to watch out and Sullivan swerved the car to the left and lost control of the vehicle. (Ex. 1C at CF 00590.) Investigations by the state police confirmed that the cruise control was engaged at the time of the accident and the skid marks began in the mid or right-hand lane confirming that Sullivan had been driving in the right hand lane. (Ex. IB at CF 00319.) Other witnesses, however, stated that Sullivan had been speeding and they were not able to confirm that another car had cut in front of Sullivan. (Ex. IB at CF 00265, CF 00272-00274.)
c. Tighe and Sullivan were both employed as hairdressers at the Moe Hair Salon in Franklin, Massachusetts. The wedding on June 11, 1988, was that of Heidi Heno, another worker at the Moe Hair Salon. (Ex. 11 at 4.)
d. Sullivan and Tighe both worked until about 11:00 a.m. on June 11, 1988. After returning to their homes to dress for the wedding, Sullivan picked up Tighe and drove Tighe and Sullivan’s brother Tony to the home of Heidi Heno’s parents where the wedding ceremony was held. Sullivan was driving the new Toyota Célica convertible. Tighe testified that on the way to the wedding, Tighe and Sullivan shared one half of a marijuana cigarette. (Ex. 11 at 4-5.)
e. The wedding ceremony began at about 1:00 p.m. and ended about 1:45 p.m. After the ceremony, there was a short reception at the Heno home where beer, wine and other refreshments were made available to the guests. There was conflicting testimony as to whether Sullivan drank any alcoholic beverages at the Heno home. Tighe testified that Sullivan drank one 12 ounce beer, whereas Sullivan denied having any alcoholic beverages. (Ex. 11 at 5.)
f. Sullivan, Tighe and Tony then drove to the reception at the Bell Tower Room which began at approximately 3:00 p.m. Dinner was served between 4:00 and 4:30 p.m. Sullivan and Tighe left the reception at about 6:45 — 7:00 p.m. The accident occurred at approximately 7:30 p.m. (Ex. 11 at 5, 7.)
g. Tighe and Sullivan sat at the same table at the reception and Tighe had an opportunity to observe Sullivan throughout the afternoon. Tighe testified that during the first hour of the reception, Tighe and Sullivan each had one drink that they purchased at the bar. (Ex. 1C at CF 00587). At some point during the reception, Tighe also purchased a drink for Sullivan. (Id.) At some point during the reception, which Tighe believed to be after dinner, there were two drinks in front of Sullivan at the table. Someone else had purchased those drinks for Sullivan. (Id. at CF 00588.) Tighe had a total of four drinks, but she did not know how many drinks Sullivan consumed, (id.)
h. Tighe did not observe anything about Sullivan’s behavior or mannerisms which indicated to her that Sullivan was anything other than sober during the reception. (Ex. 1C at CF 00589.) Like the other witnesses, Tighe commented negatively on Sullivan’s attire and noted that her dress made her appear to be flirtatious and that she was boisterous. (Id.) Consistent with her conclusion that Sullivan was sober, Tighe noted that Sullivan’s speech and gait were not impaired in anyway and her eyes were clear. (Id.) (Ex. 11 at 5.)
i. Although Tighe had a total of four alcoholic drinks while she was at the Bell Tower Room, those drinks did not impair her ability to observe. (Ex. 11 at 24; Ex. 14 at 3.) Other witnesses confirmed that Tighe was sober. (Ex. 1C at CF 00612; Ex. ID at CF 00771-772.) Tighe’s ability to recall the reception and accident in detail further supported the conclusion that she was not impaired.
j. Several guests at the wedding reception testified that Sullivan was not intoxicated, and the few guests who believed that Sullivan was intoxicated based their opinions on their prior knowledge of Sullivan and her usual shy, reserved demeanor or their personal knowledge of subtle changes in Sullivan’s behavior when drinking alcohol. They could not, however, identify any behavior by Sullivan that would have put the Bell Tower Room on notice that she was intoxicated. (Ex. 11 at 7-9; 21. See also Ex. 14 at 3.)
k. Consistent with Tighe’s testimony, Sullivan denied being intoxicated while at the Bell Tower Room. She testified that she had two alcoholic drinks while at the Bell Tower Room, one before dinner and one after dinner. The one before dinner was purchased by Alan Consoletti. (Ex. 11 at 6.)
l. Sullivan then ate a full dinner of turkey, stuffing, potatoes, a vegetable and gravy, perhaps a roll. (Ex. IB at CF 00250; CF 00256-257.)
m. Sullivan testified that she had a second drink after dinner at about 5:00, which someone ordered for her from a waitress. (Ex. IB at CF 00251; CF 00256.) Sullivan denied having any additional drinks at The *86 Bell Tower Room. (Id. at CF 00251.) Sullivan denied ever speaking with either the bartender or the waitress. (Id. at CF 00256.)
n. Sullivan further testified that while at The Bell Tower Room, she felt sober, was speaking clearly, and was walking without any difficulty. (Ex. 11 at 6.)
o. State Police Officer Richard Whitehead was the first police officer at the accident scene and he was responsible for the accident investigation. He is a twenty-one year veteran of the State Police Department. Although he did smell alcohol on Sullivan’s breath, she was not demonstrating or indicating any signs of intoxication. He therefore did not conduct any sobriety tests because he believed there was no reason to do so. Officer Whitehead was very firm and consistent in his statements that Sullivan did not exhibit any signs of intoxication. (Ex. IB at CF 00321.)
p. State Police Officer David R. Paine also responded to the accident. He had an opportunity to observe Sullivan at the accident scene and interviewed Sullivan later that evening at the hospital. Officer Paine also concluded that Sullivan was not intoxicated and was firm in his opinion that Sullivan did not exhibit signs of intoxication. (Ex. IB at CF 00318.)
q. Sullivan was not charged with driving under the influence of alcohol or while intoxicated. Nor was she charged with any other motor vehicle law violations in connection with the June 11, 1988 accident. (Ex. 1 at CF 00567-00571.)
r. The state police officers were trained to detect signs of intoxication and vigilant with respect to enforcement of laws prohibiting driving while intoxicated, particularly when there was an accident involving serious bodily injury. However, first aid and life saving measures to accident victims, as well as traffic control take priority over investigations of motor vehicle law violations.
s. The two bartenders who regularly tended the bar at the Bell Tower Room were also interviewed and deposed. Tom Collins, one of the two bartenders, was a full-time high school teacher, and an experienced bartender. (Ex. 11 at 13.) Mark Hauglie, the other bartender, in addition to working at the Bell Tower Room, had worked at other restaurants, including Houlihan’s in Framingham and Ken’s Steak House. Hauglie had formal ‘TIPS” training which teaches bartenders how to detect whether a patron is under the influence of alcohol and how to cut a patron off from additional alcohol. Neither Hauglie nor Collins could recall the Heno reception. However, both testified that they are constantly vigilant for signs of intoxication and have “shut-off attendees of other functions at the Bell Tower Room. (Ex. 11 at 13.) Flynn reported that both Collins and Hauglie made “very good appearances.” (Ex. 11 at 14.)
t. In June 1988, Maiy D’Onofrio was the manager of the Bell Tower Room. It was concluded that Ms. D’Onofrio would make an “excellent” witness on her own behalf and on behalf of the Bell Tower Room. (Ex. IB at CF 00328.) She has many years experience in food service and managed the Bell Tower Room for approximately seven years. D’Onofrio could not remember anything in particular concerning the June 11, 1988 reception, nor could she remember any problems at that reception. (Id.) It was her consistent practice to closely watch the guests at a reception to see if anyone had a little too much to drink, and if so, to inform the servers immediately. (Id. at CF 00339.)
u. Not a single witness testified that they saw Sullivan being served by the Bell Tower Room at a time when she was exhibiting signs of intoxication.
v. Tighe could not prevail merely by proving that Sullivan became intoxicated or that she was served alcohol by the Bell Tower Room. It was not sufficient for Tighe to prove that Sullivan became intoxicated at the Bell Tower Room because “[a] tavern keeper does not owe a duty to refuse to serve liquor to an intoxicated person unless the tavern keeper knows or reasonably should have known that the patron is intoxicated.” Cimino v. Milford Keg. Inc., 385 Mass. 323, 327 (1982). “[T]he negligence lies in serving alcohol to a person who already is showing discernable signs of intoxication.” Vickowski v. Polish Am. Citizens Club of the Town of Deerfield, Inc., 422 Mass. 606, 610 (1996) (emphasis added). Tighe was also required to prove that the Bell Tower Room knew or should have known of that intoxication, and then continued to serve her. (Id.) After carefully reviewing the evidence, Catholic Reliefs own attorneys at Morrison, Mahoney & Miller concluded that “there is no evidence that the Bell Tower Room served Sullivan while she was intoxicated." (Ex. 14 at 12.)
53. Also in his November 18, 1991 report, Flynn reported that Ms. Tighe would make a very sympathetic witness and that the case would likely go to a jury and not be decided by a directed verdict for the Diocese:
Given the conflicting nature of the testimony and the questionable validity of the blood alcohol test we would expect that the jury would have difficulty determining that Ms. Sullivan was obviously intoxicated when served at the Bell Tower Room. While the question could be determined otherwise by the jury, we would expect that a jury would probably determine that the evidence does not warrant a finding that Ms. Sullivan was served liquor under circumstances where the Bell Tower Room knew or should have know[n] that she was intoxicated when served.
(Emphasis added.)
54. Flynn also reported that a blood alcohol test was performed on Sullivan at the hospital following the accident. The result of that test was that Sullivan had a blood alcohol content of .223. However, as of the December 3, 1991 claim committee meeting, Flynn did *87 not know if the test was a blood plasma test or a whole blood test. A blood plasma test would result in a higher figure than a whole blood test. Flynn noted that he expected that a blood plasma study was performed and that a conversion to whole blood would calculate to approximately .19. (Ex. 11 at 21-22.)
55. The time that the blood sample was drawn also was not indicated on the medical records, (id.) Bucke and the committee members knew that the timing of a blood test is important in determining the blood alcohol level at the time of last service. Other factors in addition to the timing of the last service also can affect the absorption, elimination and distribution of alcohol in the bloodstream. In addition, individuals vary greatly with respect to their tolerance to alcohol, and therefore the observation of the witnesses at the time of service is strong evidence of whether an individual exhibited signs of intoxication.
56. The LLJUA claim committee requested that Flynn further investigate the blood alcohol test and report back.
57. OnNovember21,1991, Cosgrove wrote to Flynn (the LLJUA) and Catholic Relief to demand settlement by the insurers, specifically demanding that the LLJUA offer its full policy limit of $500,000 and coordinate settlement with Catholic Relief. Cosgrove’s letter did not discuss the merits or even the facts of Tighe’s claim, but instead only noted the potential for “massive” exposure and his concern that any award against the Diocese under G.L.c. 93A might not be covered by insurance. (Ex. 1C at CF 00422-00427.) By letter dated November 26,1991, Cosgrove repeated his demands to the insurers on behalf of the Diocese. (Ex. 1C at CF 415; Ex. 2 at 0050.)
58. By letter dated November 27, 1991, Flynn, after consulting with Cosgrove, responded to Tighe’s demand letter of October 28, 1991. The response stated that the liability of the Diocese was not reasonably clear and thus, the LLJUA was declining to make a settlement offer. (Ex. IB at CF 00384.)
59. On December 3, 1991, the LLJUA claim committee reviewed the Tighe suit. Present at the meeting were committee members Joseph I. Quinn, chairman of the LLJUA, E. Thomas McCabe, Vice Chair of the LLJUA and Robert Shaugnessy. Also present were Charles W. Bucke and Frank Flynt of the LLJUA, Hugh Bolton and Frank Dayton from Alexsis; and LLJUA general counsel Steven L. Schreckinger. Flynn also attended a portion of the meeting to discuss the Tighe case and answer any questions that the committee might have.
60. McCabe and Shaugnessy were both restaurant owners who had been appointed to the LLJUA board by the Commissioner to serve as representatives of insured liquor licensees. Both had served on the board and the LLJUA claim committee since the LLJUA was established. Quinn was appointed to the LLJUA Board to serve as a representative of insurance brokers and agents. Flynt had recently been hired by the LLJUA as a claim adjustor. Flynt had over 30 years experience in claims handling as an employee of USF&G.
61. All of the LLJUA claim committee members were provided with a copy of Flynn’s November 18, 1991 report. At the December 3, LLJUA claim committee meeting, the members reviewed the evidence and concluded that the LLJUA should decline to make a settlement offer because it appeared that Tighe would have difficulty in satisfying her burden of proof and the Diocese had strong defenses to Tighe’s claims, notwithstanding the catastrophic nature of the injuries to Tighe:
a. Flynn reported to the LLJUA that Ms. Tighe was rendered a C-5 quadriplegic at the age of 19 and would be confined to a wheelchair for life; [Tr. Ex. 11; Testimony of Charles Bucke.]
b. Tighe had medical bills in the amount of $343,308 and substantial future medical costs and loss of wages; [Tr. Ex. 11; Testimony of Charles Bucke.]
c. Tighe would make a favorable impression on the jury; [Tr. Ex. 11; Testimony of Charles Bucke.]
d. The exposure presented would be in the range of $3-5 million (without reduction for comparative negligence); [Tr. Ex. 11; Testimony of Charles Bucke.]
e. Flynn assessed the percentage of liability attributable to Tighe at between 20-35%; [Tr. Ex. 11; Testimony of Charles Bucke.]
f. Interest on any judgment would be in the amount of approximately 24%-36%; [Tr. Ex. 11; Testimony of F. Jay Flynn.]
g. Flynn believed that the Tighe Action would not be decided by a directed verdict or a reviewed motion for a directed verdict; [Testimony of F. Jay Flynn.]
h. Flynn expected “sufficient facts to be presented to warrant juiy determination, a determination which could go either way or result in a compromised or reduced verdict.” [Tr. Ex. 11.]
62. In reaching its conclusion that a settlement offer was not warranted, the LLJUA claim committee considered: (i) the information presented in Flynn’s November 18, 1991 report; (ii) the law governing liquor liability claims; (iii) the testimony of the witnesses who observed Sullivan at the Bell Tower Room; (iv) the testimony of the staff of the Bell Tower Room; (v) the testimony of Tighe and Sullivan concerning Sullivan’s consumption of alcohol and her behavior while at the Bell Tower Room; (vi) the testimony of the state police officers who observed Sullivan at the accident scene and later in the hospital; and (vii) Sullivan’s blood alcohol concentration.
*88 63. The claim committee concentrated on the issue of liability and not on the potential of additional coverage under the Catholic Relief policies. At the time of the December 3, 1991 claim committee meeting, the LLJUA was aware of the existence of the Catholic Relief policies, but Catholic Relief had not acknowledged that its policies provided coverage for the Tighe suit, thus, questions remained as to whether there was coverage under the Catholic Relief policies. By letter to the Diocese dated November 27, 1991, Catholic Relief rejected the Diocese’s request that Catholic Relief settle the Tighe suit, stating that it was questionable whether the Sacred Heart Church or the Bell Tower Room was insured under its policies. (Ex. 1C at CF 00430.) A copy of Catholic Reliefs letter was received by the LLJUA shortly after November 27, 1991.
64. By letter dated December 4, 1991, Bucke responded to Cosgrove’s November 26, 1991 letter. Bucke’s letter summarized the evidence and explained that the liability of the Bell Tower Room was not reasonably clear and, therefore, the LLJUA would not make an offer of settlement at that time. Also, Bucke told Cosgrove that if he believed the facts of the case warranted settlement, then the LLJUA would be happy to discuss those facts with Cosgrove and Catholic Relief. Bucke further explained why the “special events” policy did not apply to the Tighe suit, and confirmed that the LLJUA would provide coverage under the policy issued to the Bell Tower Room. Bucke sent to Catholic Relief a copy of the December 4, 1991 letter. (Ex. IB at CF 00381.)
65. Neither the Diocese nor Catholic Relief accepted the LLJUA’s offer to meet to discuss the evidence. In fact, the Diocese never responded to Bucke’s letter of December 4, and Catholic Relief responded only to discuss coverage issues.
66. After learning of the Catholic Relief coverage, Flynn advised Tighe’s counsel that in addition to the $500,000 coverage available under the LLJUA policy, the Diocese also had liability coverage from Catholic Relief with limits of $10,000,000. Flynn was obligated to make this disclosure in supplementation of his answers to Tighe’s previous interrogatories concerning the available insurance coverage. Tighe did not increase her $2,000,000 settlement demand after learning of the additional coverage.
67. On February 3, 1992, Flynn notified Catholic Relief and the LLJUA that trial had been continued to April 6, 1992. (Ex. 1C at CF 00408.)
68. The LLJUA claim committee held a second meeting, on March 31, 1992, to evaluate further potential settlement of the Tighe suit. Present at the meeting were committee members LLJUA Chair Joseph Quinn, Thomas McCabe, Robert Shaughnessey, Kenneth Pierce and Joseph Donahue. Bucke and Flynt were also present. Pierce was an experienced insurance claims manager who served as Manager of Aetna Casualty & Surely Company’s Boston office. Donahue was employed by Traveler’s Insurance Company. Flynn again made a presentation to the Committee and reviewed the evidence. Flynn’s November 18,1991 report also was provided to those committee members who had not been present at the December 3, 1991 meeting concerning the Tighe suit.
69. At the meeting on March 31, 1992, Bucke and the committee carefully considered new information which had not been available at the prior committee meeting, including the expected testimony of plaintiffs expert toxicologist Martin Cohen, Ph.D. and the defense expert toxicologist, Brian Pape, Ph.D. In addition, Flynn reported that discovery had confirmed that the blood alcohol test was a blood plasma test which equalled a whole blood reading of .192.
70. Since the December 3, 1991 LLJUA claim committee meeting, Flynn had deposed Helen Chamberlain (“Chamberlain”), the laboratory manager at the Milford Whitinsville Hospital where Sullivan was taken following the accident. Chamberlain was unable to determine at what time the blood sample was drawn. Chamberlain’s deposition also revealed that there was no record as to who drew the blood sample or how it was taken, and that the laboratory’s logs from June 11, 1988, had been discarded. In addition, Chamberlain’s deposition revealed that the machine used to test blood samples at Milford Whitinsville Hospital on June 11, 1988 had been tested with a control test sample with a known alcohol content. The machine reported a result for the test sample that was higher than the known alcohol content of the sample, demonstrating that results from the machine were somewhat elevated.
71. Flynn concluded that Chamberlain’s testimony was helpful to the defense and that he would be able to use the information gained to impeach the validity of the blood alcohol test. Catholic’s counsel, who was also present at the deposition, noted that Chamberlain “inferred that, considering the margin of error, Ms. Sullivan’s blood alcohol level could have been considerably lower, below the level of illegality.” (Ex. 14 at 4.)
72. Bucke had seen Dr. Pape testify on previous occasions, both on behalf of and adverse to liquor licensees. Bucke believed that Dr. Pape would be an effective expert witness for the Diocese. It was also significant to Bucke that there had been other times when Dr. Pape had advised the LLJUA that his analysis did not support the defense and that he therefore could not testify. In the Tighe suit, however, Dr. Pape agreed to testify on behalf of the Diocese. Catholic Reliefs insurance practices expert agreed that Dr. Pape was the expert of choice for parties in a liquor liability case.
73. Flynn also reviewed Dr. Pape’s report with the LLJUA claim committee. Dr. Pape’s report showed that even assuming the validity of the results from the blood test, at the time Sullivan last consumed alcohol at the Bell Tower Room, her blood alcohol level was *89 between .11% and .17%, consistent with having had 5 to 8 drinks. Assuming that Sullivan did not consume alcohol uniformly throughout the reception, her BAC at the time of last “service" could have been less than .10%. Significantly, Dr. Pape would testify that “most people would not exhibit visible or obvious signs of intoxication unless their BAC was more than about 0.15%.” (Ex. 1 at CF 00787, 00792-00795.) Based on the Chamberlain deposition and Dr. Pape’s report, Flynn concluded that the blood alcohol level would be admissible, notwithstanding the issues previously explored concerning its reliability, but that it could be used to support the defense.
74. Based on its March 31, 1992 review of the evidence, the LLJUA claim committee determined that a pre-trial settlement offer should not be authorized.
75. Although the LLJUA claim committee did not extend settlement authority, it was understood that Bucke would continue to monitor case developments and attend the trial, as was LLJUA’s customary practice. In the event of new developments, Bucke could contact the LLJUA claim committee to obtain settlement authority, without convening another meeting of the committee. Instead, if necessary, Bucke could obtain authority by telephone and did not need to reach all of the committee members. Indeed, Bucke had settled suits against other LLJUA insureds during trial when unexpected adverse developments warranted that a settlement offer be extended during trial.
76. In makingits decisions on March 31, 1992, and December 3, 1991, the LLJUA utilized its committee members and employees substantial claim experience. Bucke, the LLJUA and Flynn previously had defended with success such claims at trial. An insurer reasonably may believe that although jurors may be sympathetic towards a seriously injured plaintiff, jurors are able to follow the Court’s instructions that sympathy may not be considered when determining whether a plaintiff has met her burden of proof on establishing liability, and that the juiy should not consider the fact of an accident or a serious injury as evidence of negligence.
77. By the March 31, 1992 meeting, the LLJUA knew that Catholic Relief believed that a settlement offer should be made to Tighe, and that Catholic was willing to contribute towards a combined offer of $500,000. In December, 1991, Catholic Relief first established a loss reserve for the Tighe case, set at $500,000 by Ray Miller (“Miller”). The reserve was set after Miller had reviewed Flynn’s November 18, 1991 report. Catholic Relief never increased the Tighe case reserve. (Ex. 2 at 0002-0003.) Miller explained that he set reserves based on his estimate of what Catholic Relief would be required to pay at the end of the case. Miller was responsible for periodically reassessing the reserves on a claim.
78. The LLJUA consistently held the position that there was no evidence that the Bell Tower Room served Sullivan at a time when its employees knew or should have known that she was intoxicated. At no time relevant to this case did the Diocese, Catholic Relief or its counsel, Morrison, Mahoney and Miller, provide the LLJUA with facts or argument disputing the LLJUA’s position.
79. Catholic Relief had retained Morrison, Mahoney & Miller to represent it with respect to the coverage issues and to monitor and evaluate the Tighe suit. Morrison, Mahoney and Miller partner Paul S. Grand (“Grand”) took primary responsibility for evaluating and monitoring the Tighe suit and partner Stephen J. Andrick (“Andrick”) took primary responsibility for addressing the coverage issues. On December 11, 1991, Grand contacted Flynn and requested copies of the relevant pleadings, discovery, investigations and correspondence. Flynn cooperated with the Morrison, Mahoney & Miller’s attorneys and provided them with full access to his flies. An attorney from Morrison, Mahoney & Miller also attended the remaining depositions. On March 5, 1992, Grand sent Catholic Relief a report summarizing the evidence and the applicable law governing Tighe’s claims. In that report, Morrison, Mahoney & Miller concluded that:
[TJhere is no evidence that the Bell Tower Room served [Sullivan] while she was intoxicated. Therefore, it would appear that the plaintiff may have difficulty meeting her burden of proof on this issue. (Emphasis added.)
(Ex. 14 at 12.)
80. Catholic Relief did not inform the LLJUA that it believed that the suit should be settled until a letter dated March 24, 1992 from Grand to LLJUA attorney Cassandra Warshowsky. Grand stated that he believed an offer of $500,000 should be made and that the LLJUA should pay two-thirds of the settlement. Grand did not discuss liability or otherwise explain why the offer should be made. (Ex. 2 at 0228.)
81. In March 1992, Bucke spoke with Grand and explained why the LLJUA had concluded that liability was questionable and therefore did not believe a settlement offer was warranted. Bucke also explained to Grand that while Bucke recognized that some insurers might make a costs of defense or other modest settlement offer to close the file on a case in which liability is doubtful, it was not the LLJUA’s practice to make such offers in cases where it believed that the insured was not liable.
82. On April 2, 1992, Flynn again notified both the LLJUA and Catholic Reliefs counsel that the Tighe Action would be tried on April 6, 1992 and also that Ms. Tighe’s counsel would settle for $2,000,000, but that this settlement offer would remain open only until 3:00 p.m. on April 3, 1992. [Tr. Ex. ID, C.F. 786] As of April 2, 1992, the LLJUA continued to maintain its no settlement position. [Testimony of Bucke]
*90 83. On April 3, 1992, Miller spoke to Andrick, at Morrison, Mahoney and Miller, who advised Miller that Catholic Relief should make an offer of its full $1,000,000 primary policy limits “as a strategy” to force the LLJUA to offer its policy limits. Miller did not believe that the case would settle at that amount but authorized Andrick to make the offer. (Ex. 2 at 0275.) Miller was concerned that if Catholic Relief had not tendered its $1,000,000 primary policy limits, that Catholic Relief, in its capaciiy as umbrella insurer, might not be able to pursue a claim against the LLJUA alleging that the LLJUA should have tendered its primary limits. On this date, Catholic Relief offered $1,000,000 to Ms. Tighe. [Testimony of Miller.]
84. Catholic Relief never notified the LLJUA in advance that it intended to offer $1,000,000 to Tighe. The LLJUA did not consent to the settlement of the Tighe suit as required under an express condition to coverage contained in its policy with the Diocese. On April 3, 1992, Andrick faxed a letter to Schreckinger reporting that Catholic Relief was willing to offer its $1,000,000 primary limits toward a settlement and demanded that the LLJUA tender its $500,000 policy limits. Andrick purported to make the demand on behalf of Catholic Relief in its status as the umbrella insurer for the Diocese. Andrick stated that if a judgment were entered in excess of the primary policy limits, Catholic Relief would pursue the LLJUA. Andrick did not inform the LLJUA that Catholic Relief had already offered its $1,000,000 limits and that its offer was under consideration by Tighe. Nor did Catholic Relief state any facts concerning the liability of its insured to support its demand. Instead, Catholic Relief merely referred to the “catastrophic injuries" and potential exposure of “several million dollars.” (Ex. ID at CF 00776.)
85. Tighe accepted Catholic Reliefs offer on April 8, 1992. Catholic Relief subsequently paid Tighe $1,000,000 and on July 29, 1992, Tighe released the Diocese from all claims (Ex. 2 at 0306; Amended Complaint, 31 and Ex. M).
86. Even if Catholic Relief had sought the LLJUA’s contribution to the $1,000,000 settlement prior to its having extended the offer, the LLJUA would have refused to contribute any money. The LLJUA was aware that there was substantial potential exposure above its policy limits and that, in deciding not to explore settlement, it was risking the assets of its insured and others. [Testimony of Charles Bucke.]
87. The LLJUA considered the following factors, among others, in determining the disposition of the Tighe Action:
a. the large potential exposure above the LLJUA’s policy limit;
b. extensive medical bills and the catastrophic injury;
c. the plaintiffs relatively low demand;
d. that Ms. Tighe was served at least two drinks by the Bell Tower Room although she was a minor;
e. that there was some evidence that Ms. Sullivan was loud and boisterous;
f. that a jury could be expected to have considerable sympathy for Ms. Tighe;
g. that the co-defendant’s coverage (Ms. Sullivan) was in the amount of $25,000;
h. that Ms. Sullivan’s blood alcohol count was apparently above the “inferential limit”;
i. that there is joint and severable liability in Massachusetts; and
j. the insured’s input.
88. On March 26, 1993, almost one year after Catholic Relief settled the Tighe suit, Catholic Relief obtained the signature of the Diocese on a document entitled “Assignment of Rights to Catholic Relief Insurance Company.” The document assigned to Catholic Relief any claims that the Diocese might have against the LLJUA concerning the Tighe suit. (Ex. 6.) The document recites as consideration Catholic Reliefs prior settlement of the Tighe suit, which Catholic Relief contends it was obligated to pay regardless of any assignment by the Diocese.
V. FACTUAL CONCLUSIONS
89. The liability of the Bell Tower Room in the Tighe suit never was reasonably clear and was questionable at best.
90. There were legitimate and substantial questions as to whether Tighe could prevail on her claims against the Bell Tower Room.
91. Other insurers settle claims where liability is questionable. It is neither unreasonable for such insurers to do so, as the plaintiff herein did, considering all necessary and important factors, nor is it unreasonable for other insurers not to settle, given questionable liability, on appropriate investigation and consideration of the factors significant to the decision.
92. The LLJUA’s decision not to extend a pretrial settlement offer to Tighe was reasonable and was made in good faith.
93. Reasonable insurers in the LLJUA’s position could have declined to make a settlement offer of the Tighe Action.
RULINGS OF LAW
I. THE VOLUNTARY PAYMENTS CLAUSE
The LLJUA’s insurance policy required it to defend law suits against the Diocese seeking personal injury damages and gave the LLJUA the option of settling any claim or suit that it deemed appropriate. On the Diocese, the policy imposed the condition that it would not voluntarily make a non-emergency payment, assume any obligation, or incur any expense without the prior consent of the LLJUA. Thus, this “voluntary *91 payments" clause required the Diocese to acquire the LLJUA’s consent prior to settling any claim against it.
As a matter of law, the breach of the voluntary payments clause bars recovery for a settlement entered into without the insurer’s consent. Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 123 (1991). Voluntary payment provisions are enforceable in Massachusetts.[3] Id. However, a violation of the voluntary payments provision will bar recovery only where the breach frustrates the purpose underlying voluntary payments provisions — "to give an insurer the opportunity to protect its interests." Id., citing MacInnis v. Aetna Life & Cas. Co., 403 Mass. 220, 223 (1988). Moreover, “an insurer seeking to disclaim liability because of a breach [of the voluntary payments provision] must demonstrate that the breach actually prejudiced the insurer’s position.” Augat, 410 Mass. at 123 (citations omitted).
Catholic Relief argues that the voluntary payments provision should not be enforced because the $1,000,000 settlement was reasonable and, thus, the LLJUA was not prejudiced by it. However, the Supreme Judicial Court recently held that a showing of prejudice is not required when the evidence clearly indicates that the breach of the voluntary payments provision undermined the insurer’s ability to protect its interests. Id.
In Augat, the insured, Augat, Incorporated, faced liability to the Commonwealth under G.L.c. 2 IE for the cleanup of environmental contamination on its property. Augat entered into a consent decree with the Commonwealth to pay for environmental clean-up on the insured land prior to notifying, and thus without the consent of, the insurer. When Augat later sought indemnification from the insurer for its environmental liability under the consent decree, the insurer denied coverage on the ground that, by settling without prior consent, Augat violated the voluntary payments clause contained in its policy. Id. at 419 and n.3.[4] The Supreme Judicial Court strictly enforced the voluntary payments clause, reasoning that once the claim was settled and paid by the insured, “it was too late for the insurer to act to protect its interests.” Id. at 123. Moreover, the court held that no showing of prejudice was required because “the record clearly established] that Augat’s breach of the voluntary payments provision undermined [the insurer’s ability to protect its interests].” Id.
Like the insured in Augat, Catholic Reliefs failure to obtain the LLJUA’s consent to settle necessarily frustrated the voluntary payments clause’s underlying purpose of protecting the LLJUA’s interests. Therefore, like in Augat, no proof of prejudice is required in the present case.
Catholic Relief also argues that the risk, or even the likelihood, of damages in excess of the settlement amount rendered its decision to settle involuntary and, thus, excuses compliance with the voluntary payments clause. This argument also is without merit. See Augat, 410 Mass. at 122.
In Augat, Augat contended that its settlement with the Commonwealth was not voluntary because, if it did not settle, it faced the risk of far greater liability, including treble damages. Id. at 120. The court disagreed, however, concluding that the settlement was voluntary because, although it was influenced by the risk of greater exposure, the insured “had an alternative — it had the right to demand that [the insurer] defend the claim and assume the obligation to pay for the cleanup." Id. at 122. Here too, the decision to settle was voluntary, despite the risk of liability in excess of the settlement amount, because the option existed to defend the claim (which was the LLJUA’s preferred course of action) and seek indemnification for any excess judgment that might be entered.
Catholic Relief further argues that the LLJUA wrongfully breached its duty by failing to settle when no reasonable insurer would have failed to settle, and is, therefore, not entitled to assert its rights under the voluntary payments provision. Compliance with the voluntary payments clause may be excused if the insurer has breached its duly to defend by failing to retain counsel to defend the insured. Berke Moore Co. v. Lumbermens Mut. Casualty Co., 345 Mass. 66, 70-71 (1962). That rule has no application here because the LLJUA did not breach its duty to defend. See Romstadt v. Allstate Ins. Co., 59 F.3d 608, 613 (6th Cir. 1995) (“Where the insurer did not refuse to defend its insured,” the insured’s breach of the voluntary payments clause will not be excused).
A breach of an insurer’s duty to defend excuses compliance with the voluntary payments provision because a contrary result would leave the insurer in control of settlement even when it has wrongfully disclaimed coverage and failed to provide a defense. This would leave the insured in the untenable position of having to fund its own defense without having control over settlement.
For support, Catholic Relief relies on cases such as Sarnafil, Inc. v. Peerless Ins. Co., 418 Mass. 295 (1994). In Sarnafll, the insured sought reimbursement of legal fees in defending a counterclaim on the grounds that the insurer breached its duty to provide representation or even to investigate the claim. Id. at 302. The insurer contested coverage, countering that the insured had violated the insurance policy’s voluntary payments provision thereby leaving it without adequate opportunity to protect its interests. In reversing and remanding the case for trial, the Supreme Judicial Court determined that summary judgment was inappropriate when there was sufficient evidence for a jury to find that the insurer breached its duly to defend by failing to investigate the facts or notify the insured of its decision to deny coverage in a timely manner. Id. at 302-306.
*92 Catholic Reliefs reliance on Sarnafil is misplaced. The LLJUA provided the Diocese and The Bell Tower Room with a defense. Unlike the insurer in Sarnafil, the LLJUA started its investigation of the incident involving Tighe and Sullivan as soon as it was notified by the Diocese of the potential claim. Also, at no time did the LLJUA deny coverage or refuse to provide the Diocese with a legal defense. Moreover, Sarnafil is not on point for the additional reason that, unlike Catholic Relief in the present case, the insured in Sarnafil was not seeking indemnification from a settlement, but was only seeking reimbursement of its defense costs. Sarnafil, 418 Mass. at 296. Thus, because the LLJUA provided its insured with a defense, Catholic Reliefs reliance on cases dealing with duly to defend, such as Sarnafil, Inc. v. Peerless Ins. Co., 418 Mass. 295, 302-306 (1994), is misplaced.
Even if there were a basis for excusing an insured from compliance with the voluntary payments clause where the insured’s liability was reasonably clear and the insurer, therefore, had a duty to settle, this is not such a case. As Catholic Relief and its own attorney and expert witnesses have acknowledged, the liability of the Bell Tower Room was questionable. There were legitimate questions on the critical issues of whether the Bell Tower Room knew or should have known that Sullivan was intoxicated, and whether the Bell Tower Room served Sullivan after it knew or should have known that she was intoxicated. Under these circumstances, the liability of the Diocese was not clear as a matter of law. Where, as here, the insurer has fulfilled its duly to defend the insured and where liability is not reasonably clear, there is no basis for excusing compliance with the voluntary payments clause.
The LLJUA did not consent to Catholic Reliefs $1,000,000 settlement of the Tighe action. Once the Diocese and Catholic Relief settled the Tighe suit, there was nothing that the LLJUA could do to protect its interests. By settling without the prior consent of the LLJUA, the Diocese (and Catholic Relief seeking to recover as the assignee, subrogee or co-insurer of the Diocese) failed to satisfy a condition precedent to any duty that the LLJUA might have had to indemnify the Diocese (or Catholic Relief) for any sums paid to Tighe. Therefore, the LLJUA is entitled to judgment on Catholic Reliefs claims as a matter of law.[5]
II. CONTRIBUTION BETWEEN CONCURRENT INSURERS
Catholic Relief asserts that it has a right of contribution against the LLJUA that is not dependent on the Diocese’s contract rights under the policy and, thus, survives despite the alleged breach of the voluntary payments provision. Catholic Relief, however, fails to cite to any authority for such a proposition.[6] There is no independent duty between concurrent insurers. See Allstate Ins. Co. v. United Serv. Auto Ass’n, 452 S.E. 2d 859, 861 (Va. 1995); Aetna Casualty & Sur. Co. v. Chicago Ins. Co., 994 F.2d 1254, 1257 (7th Cir. 1993). Although Catholic Relief may have had some interest, as an excess insurer,[7] in acting to protect itself against the possibility of an judgment in excess of the settlement, it can not bring a direct cause of action against the LLJUA for contribution based on its own potential exposure. Hartford Casualty Ins. Co. v. New Hampshire Ins. Co., 417 Mass. 115, 124 n.7 (1994) (“The general rule is that an excess insurer has a claim based on equitable subrogation but no right to a direct action against the primary insurer”).[8]
In order for Catholic Relief to be entitled to contribution from the LLJUA, it is required to establish that the LLJUA is liable to the Diocese. See United Services, 452 S.E.2d at 862 (on facts similar to the present case, court determined that settling insurer was not entitled to contribution because provision requiring consent of nonsettling co-excess insurer precluded liability); see also Aetna Casualty & Sur. Co. v. Chicago Ins. Co., 994 F.2d 1254, 1257 (7th Cir. 1993) (“the defendant insurance company must have been liable to the insured in order for the plaintiff insurance company to recover”). Any liability of the LLJUA derives exclusively from its policy issued to the Diocese, which required the consent of the LLJUA to any settlement.[9]
Catholic Relief cannot succeed on its claim for contribution because the voluntary payment condition in the LLJUA’s policy was not met and, therefore, the LLJUA never became obligated to pay on the claim. United Services, 452 S.E.2d at 862; See also State of New York v. Blank, 27 F.3d 783, 794 (2nd Cir. 1994) (concurrent insurer seeking contribution from another insurer must comply with policy provisions). The LLJUA therefore has no liability to the Diocese on which Catholic Relief may base a claim for contribution.
The cases cited by Catholic Relief, in support of its assertion that it has a right of contribution for any reasonable settlement, are inapposite. In none of the cited cases did the non-settling insurer assert a right to defend rather than settle the underlying claim. For example, Mission Ins. Co. v. United States Fire Ins. Co., 401 Mass. 492 (1988), involved two excess insurers. The defendant insurer, U.S. Fire, declined to participate in settlement discussions with the two primary insurers and the plaintiff excess insurer, Mission. U.S. Fire argued that its coverage was excess even to Mission’s excess coverage. Thus, the issue in Mission was whether U.S. Fire’s coverage was excess to or concurrent with that of Mission. Therefore, in Mission, the court was not faced with the same issue before this court, whether a primary insurer has a claim of contribution from a co-primary insurer despite a failure to comply with the voluntary payments provision.
Catholic Relief also cites as support, Travelers Ins. Co. v. Aetna Ins. Co., 359 Mass 743 (1971). Travelers Ins., however, is a rescript opinion with little discussion of the facts or legal analysis. Among other things, it is unclear whether Aetna breached its duty to defend *93 by denying coverage. Nevertheless, it is apparent that Aetna, like U.S. Fire in the Mission case, did not object to the settlement of the underlying claim. Id. Unlike in the case at bar, Aetna argued only that its policy did not provide coverage for the claim. Id. Thus, Travelers does not support a right of contribution in this case.[10]
III. COMMON LAW CLAIMS
Catholic Relief also asserts claims of negligence and bad faith against the LLJUA for breach of its common law duly to settle.[11] Courts have fashioned a cause of action where an insurer wrongfully fails to settle a claim and a judgment enters in excess of the insured’s policy limits. See Romstadt v. Allstate Ins. Co., 59 F.3d 608, 614 (6th Cir. 1995); DiMarzo v. American Mut. Ins. Co., 389 Mass. 85, 101-02 (1983); Murach v. Massachusetts Bonding & Ins. Co., 339 Mass. 184, 187 (1959). A cause of action for wrongful failure to settle (whether labeled as negligence or bad faith) derives from common law and sounds in negligence. See Hartford, 417 Mass. at 118-20; Abrams v. Factory Mut. Liab. Ins. Co., 298 Mass. 141, 144-45 (1937). To prevail on a claim for wrongful failure to settle, the insured must prove the basic negligence elements of duty, breach, causation, and damages. See, Hartford, 417 Mass. at 125 (causation); First State Ins. Co. v. Utica Mut. Ins. Co., 870 F.Supp. 1168, 1178 (D.Mass. 1994) (damages).
Because Catholic Relief failed to prove a necessary element of its claims, that the Diocese suffered damages as a result of the LLJUA’s actions, the LLJUA is also entitled to judgment on Catholic Reliefs common law claims of negligence and bad faith.[12]
However, the Diocese (and Catholic Relief) settled the underlying suit and thus prevented a judgment from entering. Because no judgment entered in excess of the primary policy limits, Catholic Relief is unable to demonstrate that the Diocese (or itself) suffered any damages as a result of the LLJUA’s decision not to enter into a pretrial settlement with Tighe. “[I]mplicit in bringing an action against an insurer for bad faith with respect to settling a claim within its policy limits, is a requirement that a judgment in excess of the policy limits be entered in the underlying suit.” Romstadt, 59 F.3d at 611. See also Campbell 639 A.2d at 659; Finkelstein v. 20th Century Ins. Co., 14 Cal. Rptr. 2d 305, 307 (Cal. Ct. App. 1992); Doser v. Middlesex Mut. Ins. Co., 162 Cal. Rptr. 115, 119 (Cal. Ct. App. 1980); 7C Appleman, Insurance Law and Practice, §4713 at 514-15 (1979) (“The cause of action in favor of the insured does not arise against the insurer until a judgment in excess of policy limits is returned by a jury. . .”).
The existence of a judgment in excess of the policy limits was a prerequisite to Catholic Reliefs claim, because in the absence of such a judgment, Catholic Relief could not show that its subrogor or assignor, the Diocese, (and, thus, itself) suffered any harm as a result of the LLJUA’s decision not to settle the Tighe action. See DiMarzo, 389 Mass. at 101-102 (damages as a result of insurer’s wrongful refusal to settle are the sums for which the insured became liable in excess of his policy coverage). Thus, the LLJUA is entitled to judgment in its favor on Catholic Reliefs common law claims because the LLJUA’s failure to settle did not cause any damages.
Even if Catholic Relief had succeeded in establishing that the LLJUA wrongfully created a risk of an excess judgment, that would not have been sufficient to establish compensable harm. Knowledge that an allegedly wrongful or negligent act has occurred is insufficient to trigger a cause of action for negligence or bad faith because it is not clear that such conduct will cause any harm. See International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc., 29 Mass.App.Ct. 215, 219 (1990) (negligence in the abstract does not support a cause of action). The mere risk that future harm may result is insufficient. Instead, a negligence claim cannot be maintained and therefore, does not accrue, without a showing of some harm resulting from the negligence. Id. at 218-20.
The decision of the Appeals Court in Spilios v. Cohen, 38 Mass.App.Ct. 338, rev. denied, 420 Mass. 1104 (1995), is particularly instructive. In Spilios, a client brought a malpractice suit against an attorney who had represented her in a divorce action. The client alleged that the attorney wrongfully rejected a substantial settlement offer against the client’s wishes. The attorney sought dismissal of the suit on the grounds that it was barred by the applicable statute of limitations, arguing that the cause of action for malpractice accrued when the client knew and complained, before the divorce trial concluded, of the alleged wrongful conduct. The Appeals Court rejected that argument and instead held that the cause of action did not accrue until a judgment entered in the divorce action that was less favorable to the client than the rejected settlement offer because until then, no harm to the client could be proven. Spilios, 38 Mass.App.Ct. at 339-40. See also Corroon & Black, 29 Mass.App.Ct. at 219-20 (insured’s cause of action against insurance broker for negligent failure to procure excess coverage did not accrue until claim against the insured settled in excess of primary policy limits).
Similarly, in this case, absent the entry of an excess judgment or indeed any adverse judgment, Catholic Relief was unable to demonstrate that the LLJUA’s decision not to settle the Tighe action had caused any harm. The LLJUA’s decision not to settle presented at most a possibility that an excess judgment might be rendered against the Diocese. However, it also presented the possibilities of a defense verdict or a verdict less than the $1,000,000 settlement. Because the LLJUA would not have been subject to liability for any alleged breach of the duly to settle if the jury in the Tighe suit had returned a defense verdict or if a judgment for less than the policy limits was entered, *94 Catholic Relief could not demonstrate that the LLJUA’s decision not to settle the Tighe suit caused the Diocese, or Catholic Relief, to suffer any compensable harm. See Spilios, 38 Mass.App.Ct. at 339-40. See also Finklestein, 14 Cal. Rptr. 2d at 307; Doser, 162 Cal. Rptr. at 119.[13]
IV. CATHOLIC RELIEF’S DIRECT CLAIMS AGAINST THE LLJUA
Even if the breach of the voluntary payments clause, and the lack of an adverse judgment in the underlying case did not require a judgment for the LLJUA, the LLJUA would be entitled to judgment in its favor because Catholic Relief failed to meet its burden to show that the LLJUA’s failure to settle the Tighe claim was a wrongful breach of duty.
At common law,[14] an insurer may be liable to an insured, or to another insurer subrogated to the interests of that insured, for failure to settle a claim only when no reasonable insurer would have failed to settle the claim. Hartford, 417 Mass. at 121. It is not sufficient to show that a reasonable insurer might have settled the claim within the policy limits. Id.
In Hartford, the court found that the evidence supported the jury’s determination that the non-settling insurer was not liable for its failure to settle within the policy limits because there was the potential for some contributory negligence to be assessed to the plaintiff and the possibility that a defendant other than the insured may have shared some liability. The Hartford court refused to overturn the jury verdict even though the underlying tort suit involved serious bodily injury and resulted in a verdict substantially in excess of the primary limits. Id. at 124. See also, Mayer v. Medical Malpractice Joint Underwriting Association, 40 Mass.App.Ct. 266, 274 (1996) (the court affirmed summary judgment in favor of the insurer under the Hartford standard, finding that, as a matter of law, there could be no liability for failure to settle where the insurer was advised by defense counsel that there was at least a fifty percent chance of success at trial and such advice was supported by the defense experts, despite jury award in excess of the policy limits in the underlying case).
In Van Dyke v. St. Paul Fire & Marine Ins. Co., 388 Mass. 671 (1983), the court affirmed summary judgment in favor of the insurer on a claim of failure to settle under G.L.c. 93A and c. 176D where information provided by defense counsel and an expert witness after the insurer’s rejection of the settlement demand established that liability was not reasonably clear. Id. at 677-78. The holding in Van Dyke is applicable here because the court in Hartford stated that the common law standard established in that case “will be in practice not significantly different from the good faith test [under c. 93A and c. 176D] that has been evolving in this Commonwealth.” Id. at 121. See also DeMeo v. State Farm Mut. Auto. Ins. Co., 38 Mass.App.Ct. 955, 957 (1995) (liability not reasonably clear under c. 93A and 176D where objective inquiry into applicable facts and law indicated 50% possibility that driver other than the insured would be found sole cause of accident by jury).
Hartford, Mayer and Van Dyke make it clear that where, as here, an insurer relies on the evaluation of defense counsel and experts to conclude that liability is not reasonably clear, there can be no liability for bad faith failure to settle, because, as a matter of law, it cannot be concluded that no reasonable insurer would fail to settle when liability is not reasonably clear.
Even if liability was reasonably clear, it is necessary to consider whether, based on the evidence of damages and reduction for contributory negligence, as applicable, other reasonable insurers would offer the policy limits in settlement. In the present case, liability of the insured was highly questionable.[15]
As acknowledged by Catholic Relief, there were substantial doubts as to whether the Bell Tower Room knew or should have known that Sullivan was visibly intoxicated and whether the Bell Tower Room served Sullivan after it knew or should have known that she was intoxicated. Indeed, Catholic Reliefs Claim Manager noted that Tighe had only a fifty percent or less likelihood of proving these critical elements. Catholic Reliefs attorneys concluded that:
Although the evidence that Ms. Sullivan was served alcohol is overwhelming, there is no evidence that the Bell Tower Room served her while she was intoxicated.
(Ex. 14 at 12) (emphasis added.)
Similarly, defense counsel Flynn reported to the LLJUA that:
[W]e would expect that the jury would have difficulty determining that Ms. Sullivan was obviously intoxicated when served at the Bell Tower Room. While the question could be determined otherwise by the jury, we would expect that a juiy would probably determine that the evidence does not warrant a finding that Ms. Sullivan was served liquor under circumstances where the Bell Tower Room knew or should have know [sic] that she was intoxicated when served.
(Ex. 11 at 22.)
Further, the defense expert toxicologist was prepared to testify that Sullivan’s blood alcohol level supported the conclusion that she likely would not have appeared visibly intoxicated at the time of her last consumption of alcohol. In addition, the witnesses who observed Sullivan while at the Bell Tower Room testified either that she was not visibly intoxicated or based their opinion of intoxication on subtle behavioral changes that would only be apparent to those who knew Sullivan well. The witnesses were consistent in their testimony that Sullivan did nothing to draw attention to herself, and that her speech and gait were not impaired. Moreover, there was substantial evidence that Sullivan obtained at least some of her *95 drinks from other patrons rather than from the Bell Tower Room staff, raising doubts as to whether Sullivan was even “served” after becoming intoxicated, even if she did become intoxicated at some point during the wedding reception. Therefore, as a matter of law, the liability of the Bell Tower Room was questionable.
In light of the facts of the underlying claim and the case law governing liability for negligent service of alcohol, Catholic Relief has not shown that no reasonable insurer would have failed to settle the underlying claim. To the contrary, the evidence on this issue established, at best, that there were legitimate doubts as to the ability of Tighe to prove necessary elements of her claim and whether a jury would find in her favor. Under these circumstances, the LLJUA’s decision to present the case to the jury rather than to join in pretrial settlement, was reasonable, and that is all that is required for the LLJUA to prevail.
Catholic Relief also argues that the case had multimillion dollar exposure over the primary policy limits and, thus, the settlement was reasonable and that no reasonable insurer would have failed to settle. However, the risk that a potential jury award could exceed the primary policy limits does not make liability reasonably clear or require settlement. See Whitney v. Continental Insurance Co., 595 F. Supp. 939, 947 (D. Mass. 1984) (liability was not reasonably clear even where insurer’s attorney recommended settlement because of the magnitude of potential damages).[16]
The fact that Tighe was rendered a quadriplegic at the age of eighteen and was prepared to present testimony that her economic damages alone exceeded $5,700,000, despite making an initial settlement demand of only $2,000,000 and settling for only $1,000,000 even though there was $10,500,000 in available insurance coverage, demonstrates that she and her attorneys recognized the weakness of her claims, and is further evidence that liability was doubtful. See Puritan Ins. Co. v. Canadian Universal Ins. Co., 775 F.2d 76, 81 (3d Cir. 1985) (testimony that plaintiffs attorney would have accepted 40% of his calculated damages is “strong evidence that a defense existed” and, thus, was evidence that the insurer was justified in trying the case).
The LLJUA insurance policy obligated it to pay only those “sums which the insured shall become legally obligated to pay ...” (emphasis added). The LLJUA’s obligation was premised on the Bell Tower Room’s legal liability to Tighe, not on the extent of Tighe’s injuries. Were the insurer’s obligation to settle premised on the extent of injuries, or were an insurer required to eliminate all risks of an excess verdict, every case would have a settlement value, frequently a substantial one where the plaintiff had suffered serious injuries, regardless of whether or not the insured was negligent or caused the claimant’s injuries.
Catholic Relief also contends that the LLJUA’s failure to settle the claim against the Diocese constituted subjective bad faith. The Supreme Judicial Court has recognized that “[i]t is conceivable that, on an objective standard of reasonableness an insurer would have been warranted in not settling a case but that the insurer’s decision was in fact motivated by subjective bad faith.” Hartford, 417 Mass. at 123. However, there is no evidence of the malice or wrongful or venal intent that would support such a claim here. See Murach v. Massachusetts Bonding Ins. Co., 339 Mass. 184, 187 (1959) (“[flor liability to attach, ‘something more must be shown than [an insurer’s] failing to make a settlement which a reasonably prudent person exercising due care “from the standpoint of the assured” would have made’ ”), quoting Abrams v. Factory Mut. Liab. Ins. Co., 298 Mass. 141, 145 (1937)).
The LLJUA’s decision not to settle was based on its review of the facts and the applicable law, and there was no evidence to suggest that it was improperly motivated. There is no basis for finding subjective bad faith. Therefore, judgment must enter in favor of the LLJUA.
V. CLAIMS ASSIGNED BY THE DIOCESE TO CATHOLIC RELIEF
To the extent Catholic Relief purported to sue as the assignee of the Diocese its claims fail because, in addition to the reasons set forth above, when the Diocese executed the assignment on March 26, 1993, it had already been released from all liability by Tighe as of July 29, 1992. Once released from liability, any claims “by the insured arising out of his liability to the injured third party ceases to exist, because the insured is no longer exposed to any excess damages.” Clement v. Prudential Property & Casualty Co., 790 F.2d 1545, 1548 (11th Cir. 1986). See also, Oppenheim v. Reliance Ins. Co., 804 F. Supp. 305, 310 (M.D. Fla. 1991) (A “release of the insured’s claims . . . bars a subsequent claim for excess damages, whether brought by [the assignee] or the insured, if the parties subsequently execute an assignment of claims”); Stubblefield v. St. Paul Fire & Marine Ins. Co., 517 P.2d 262 (Or. 1973) (when settlement agreement relieved insured doctor of obligation to pay any amount in excess of $5,000 to plaintiff, the assignment by doctor to plaintiff of all claims against insurer in excess of $5,000 conferred on plaintiff no enforceable rights). Therefore, the Diocese, which did not suffer any injury, had no valid claims it could assign to Catholic Relief and judgment must enter in favor of the LLJUA.
ORDER
For the foregoing reasons, it is ORDERED that judgment enter in favor of the defendant the Liquor Liability Joint Underwriting Association of Massachusetts, against plaintiff Catholic Relief.

Both parties were primary insurers, Catholic Relief with bodily injury limits of $1,000,000.00, and LLJUA with $500,000.00. In addition, Catholic Relief had an excess liability policy with $9,000,000.00 in coverage.

All citations are to the LLJUA’s Plan of Operation, codified at, 211 CMR 22.00, as in effect on March 31, 1986. Subsequent revisions to the Plan of Operation effective following the settlement of the Tighe suit are not relevant here.

As the Augat court made clear, provisions protecting the insurer’s rights to defend the underlying claim and to exercise its judgment with respect to settlement are fundamental to the insurer’s ability to protect its interests under the policy. Other jurisdictions also enforce clauses requiring the insurer’s consent to a settlement and deny recovery if the insured settles without the insurer’s consent. See Harville v. Twin City Fire Ins. Co., 885 F.2d 276, 279 (5th Cir. 1989); Jones v. Southern Marine & Aviation Underwriters Inc., 888 F.2d 358, 361-62 (5th Cir. 1989); Rodgers v. Missouri Ins. Guar. Ass'n, 841 F.2d 858, 861-62 (8th Cir. 1988); Diversified Mortgage Investors v. U.S. Life Title Ins. Co., 544 F.2d 571, 575 (2d Cir. 1976); Ohio Cas. Ins. Co. v. Ross, 222 F. Supp. 292, 297 (D. Md. 1963); Buysse v. Baumann-Furrie Co., 448 N.W.2d 865, 874 (Minn. 1989); Giffels v. Home Ins. Co., 172 N.W.2d 540, 543-44, (Mich. App. 1969).

The voluntary payments provision in Augat is substantially similar to the one in the LLJUA’s policy with the Diocese.

Moreover, public policy further supports enforcement of the voluntary payments clause. It is fundamental to the functioning of the liability insurance system that the right to settle cases remain vested in the insurer, at least where the insurer has complied with its contractual duty to defend. As then Professor (now Judge) Keeton explained in a seminal article addressing an insurer’s settlement obligations;
the obvious reason for the policy provision giving [the insurer] such exclusive control over the settlement decision is to keep down claims costs. If [the] insured controlled the settlement decision, self-interest would induce him to make higher settlements (up to the policy limits) because of the desire to avoid the personal risk of excess liability. Recognition of a power in [the] insured to make a settlement binding on [the insurer] is inconsistent with the fundamental premise that the liability insurance system will work more effectively if [the insurer] controls the defense and settlement than if either of these matter is left to the insured.
Keeton, Liability Insurance and Responsibility for Settlement, 67 Harv.L.Rev. 1136, 1162(1954).

Contraiy to Catholic Reliefs position, no Massachusetts case permits one primary insurer to settle a claim without the consent of a concurrent primary insurer and obtain contribution therefrom absent a wrongful denial of coverage or wrongful failure to settle. The reason for this is apparent— Catholic Relief had a right as the Diocese’s primary insurer to enter into a settlement it deemed to be reasonable. However, the LLJUA also had the right to defend an action in which liability was not reasonably clear.

As stated above, Catholic Relief insured the Diocese as both a primary insurer, for up to $ 1,000,000, and as an excess insurer, for an additional $9,000,000.

While Massachusetts courts have yet to decide the issue, the Supreme Judicial Court has observed that the vast majorily of states that have decided the question have held that an insurer owes no duty to an excess or a co-insurer which would give rise to a direct cause of action by a co-insurer or excess insurer for wrongful failure to settle. Hartford, 417 Mass. at 124 n.7. Instead, Catholic Relief must rely upon its status as the assignee or equitable subrogee of the Diocese. Id. at 124. Therefore, Catholic Relief has no greater rights than the Diocese and is subject to the same defenses as the Diocese. Id.

The LLJUA policy also specifically provides that:
1) No person or organization has a right under this policy:
b) To sue us on this Policy unless all of its terms have been fully complied with.
2) A person or organization may sue us to recover on an agreed settlement. . . An agreed settlement means a settlement and release of liability signed by us, the Insured and the claimant or the claimant’s legal representative.
(Ex. 4.)

Further, Travelers Ins. Co. v. Graye, 358 Mass. 238 (1970), also cited by Catholic Relief, did not involve a claim between insurers, but instead concerned whether an insurer has a right of subrogation to the rights of its insured against a responsible third party, despite the fact that the right of subrogation was not expressly retained in the insurance policy. Id. at 240-41. Thus, Travelers Ins. is inapposite.

In addition to excusing compliance with a voluntary payments provision, an insurer’s wrongful failure to settle a claim within the policy limits can give rise to a direct action against the insurer by the insured.

As stated above, Catholic Relief can not bring a direct cause of action against the LLJUA based on its own potential exposure. Hartford, 417 Mass. at 124 n.7. Thus, in order to prevail on its common law claims, Catholic Relief must show that the Diocese suffered some harm as a result of the LLJUA’s failure to settle.

As Judge Keeton explained, prior to an excess judgment:
there is uncertainty... as to whether any harm will result from [a breach of the duly to settle]. Even if [the insurer] is guilty of bad faith or negligence in refusing to settle, it is still possible that [the insurer’s] gamble will turn out favorably — that trial will result in a judgment against claimant or else for a sum smaller than the proposed settlement figure. In that event, payment by the insured for a release . . . would be a loss which would not have been sustained if the insured had done nothing . . .
Keeton, supra, at 1162-63.

Catholic Relief has not asserted a statutory claim against the LLJUA for violation of G.L.c. 93A or c. 176D. At the time at issue, the LLJUA was not subject to these statutes because, as a statutorily-created joint underwriting association, it is not in trade or commerce or in the business of insurance. See Poznik v. Massachusetts Med. Prof'l Ins. Ass’n, 417 Mass. 48 (1994) (holding similar statutory joint underwriting association not subject to c. 93A or c. 176D).

In order to prevail in the underlying trial, Tighe would have had to prove that the Bell Tower Room served alcohol to Sullivan after it knew or should have known that she was visibly intoxicated. Vickowski v. Polish Am. Citizens Club, 422 Mass. 606,610 (1996). It was not sufficient for Tighe to prove that Sullivan became intoxicated at the Bell Tower Room because “[a] tavern keeper does not owe a duly to refuse to serve liquor to an intoxicated person unless the tavern keeper knows or reasonably should have known that the patron is intoxicated.” Cimino v. Milford Keg, Inc., 385 Mass. 323, 327 (1982). Therefore, “the negligence lies in serving alcohol to a person who already is showing discernable signs of intoxication.” Vickowski, 422 Mass. at 610 (emphasis added).

See also Continental Cas. Co. v. Reserve Ins. Co., 238 N.W.2d 862, 868 (Minn. 1976) (“In addition to a finding of bad faith, there must be a finding of liability on the part of the insured as a condition precedent to any recovery by the excess carrier”); Anderson v. Continental Ins. Co., 271 N.W.2d 368, 376 (Wis. 1978) (no action for bad faith when a claim is “fairly debatable”); McCollough v. Golden Rule Ins. Co., 789 P.2d 855, 860 (Wyo. 1990) (“if a realistic question of liability does exist, the insurance carrier is entitled to reasonably pursue that debate without exposure to a claim of violation of its duly of good faith and fair dealing"); Eastham v. Oregon Auto. Ins. Co., 540 P.2d 364, 368 (Or. 1975) (“when there is clear liability it may be bad faith for the insurer to refuse to settle”).